IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

CHARLES WILLIAM LATTISAW, JR.
#444-499,

    Plaintiff,

v.

C.O. ERIC ROSS,[1]
CHARLES COUNTY SHERIFF TROY
  BERRY,
CHARLES COUNTY DETENTION
  CENTER DIRECTOR CAPTAIN RICE,
CHARLES COUNTY GOVERNMENT,
CHARLES COUNTY DETETION
  CENTER,

    Defendants.

Case No.: GJH-16-1258
(Consolidated with GJH-16-2469)

## MEMORANDUM OPINION

Plaintiff Charles William Lattisaw, Jr., a prisoner confined at Jessup Correctional Institution, has filed a self-represented civil rights action pursuant to 42 U.S.C. § 1983.[2] As amended by consolidation,[3] the Complaint seeks $5 million in damages against Charles County Detention Center ("Detention Center") Officer Eric Ross, Director Captain Rice, Charles County Sheriff Troy Berry, and Charles County, Maryland.

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of Defendants' names.

[2] In addition to claims brought under the Civil Rights statute, the complaint also contains state tort claims for assault, battery, and negligence.

[3] Lattisaw's first complaint, Civil Action No. GJH-16-1258, named Officer Ross and the Detention Center as defendants, and alleged that on February 28, 2014, Ross turned off the lights and water in the shower area while Lattisaw was showering, leading to injury. ECF No. 1. On June 29, 2016, Lattisaw filed a second civil action arising from the same event, adding Berry, Rice, and Charles County as defendants. That action, *Lattisaw v. Berry, et al.*, Civil Action No. GJH-16-2469, was consolidated with Civil Action No. GJH-16-1258. ECF No. 8.

Pending is a Motion to Dismiss or, Alternatively, for Summary Judgment filed on behalf of Ross, Rice, Berry and Charles County,[4] ECF No. 17, and Lattisaw's Response. ECF No. 22. No hearing is needed to resolve the issues raised. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendants' Motion will be granted.

## I. BACKGROUND

### A. Lattisaw's Allegations[5]

Lattisaw claims that on February 28, 2014, he was "assaulted in various ways (physically, sexually, verbally) by CO Ross." ECF No. 1 at 5.[6] Lattisaw states that Ross turned the lights and water on and off in the shower area. When Lattisaw stepped out of the shower to ask Ross to stop playing with the controls, Ross "stuck up his middle finger" and laughed at him. *Id.* Lattisaw resumed his shower and Ross continued to turn the water and lights on and off. Lattisaw was struck with "exceedingly hot" water that burned his "back, neck and butt," and as he hurried out of the shower, he tripped and fell in front of "15-20 other inmates" who frightened him by making "sexual remarks" toward him. *Id.* Lattisaw contends Ross's conduct constitutes "abuse and negligence," and that Ross ignored his requests for medical treatment and left Lattisaw on the floor in pain. *Id.* at 6. Lattisaw states another officer heard his cries for help and escorted him to the medical area. *Id.* Lattisaw asked Sgt. Irby to review the security camera to verify the incident, which was witnessed by other inmates. *Id.* Lattisaw claims he continues to suffer "[d]epression, anxiety, nightmares, fear and emotional [in]stability" because of the incident. *Id.*

---

[4] The Detention Center was dismissed on preliminary review, as it was not a "person" amenable to suit under 42 U.S.C. § 1983. ECF No. 3.

[5] Unless otherwise stated, the facts are taken from Plaintiff's Complaint and assumed to be true.

[6] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

### B. Defendants' Responses

Ross contends that the incident that resulted in Lattisaw's fall was an accident, Lattisaw was not denied medical care and in any event was not sexually assaulted or otherwise injured, and that the video of the incident was overwritten after review because it did not reveal any wrongdoing.

Ross has submitted an affidavit detailing the layout of the Men's Classification Unit ("MCU") where the incident occurred and explaining his actions on the day of the incident. ECF No. 17-4. The MCU is a two-tiered unit with 24 cells with a common area and a shower on each tier. *Id.* ¶ 3. Two officers are typically assigned to the MCU, one to the first floor control room and the other to the desk just outside the control room. *Id.* ¶ 4. From the main screen of the computer in the control room, an officer can control various operations in the MCU, including the opening and closing of cell doors, lights, and water to the showers. *Id.* ¶ 5. There is a specific button that controls the lights to the shower on both the first and second floors. *Id.* ¶ 6. A separate mouse-activated button controls the water to the showers. This button does not control the water flow from the shower head, but simply acts to turn the water lines running to the showers on and off. *Id.* ¶ 7. An officer cannot control the temperature of the water in the showers from the control room; the temperature is controlled at the water heaters. *Id.* ¶ 8. Because the mouse must be clicked to turn the lights on and off and also to turn the water to the showers on and off, the lights and water cannot be turned on and off simultaneously. *Id.* ¶ 9.

The shower area on the first floor includes an area that has a toilet, sink, and bench as well as a shower stall. ECF No. 17-4 ¶ 10. The shower stall is separated from the toilet area by a shower curtain. *Id.* There is a lip that inmates must step over to enter the shower that prevents

3

water from flowing into the toilet area. Similarly, there is a lip in the entrance to the toilet area that prevents water from flowing out into the common area. *Id.* ¶ 10.

Water will not flow from the shower head until the corrections officer in the control room has turned the water to the showers on. The showers are not automatically activated when the shower button is pressed on the computer in the control room. Instead, the shower heads are activated only when an inmate presses a button located below the shower head itself. When an inmate presses the button, the water turns on for approximately twenty seconds. Consequently, inmates have to continuously press the button during their showers. *Id.* ¶ 12. If the water to the showers is turned off in the control room while water is flowing from the shower head, the water will stop flowing. *Id.* ¶ 13. Water will not automatically flow from the shower head when the water is turned back on in the control room. Once the water has been turned back on in the control room, an inmate must press the button below the shower head to turn the water back on for an additional twenty seconds. *Id.* Neither inmates, nor the corrections officer in the control room, have control over the temperature of the water that comes from the shower head. *Id.* ¶ 14.

Inmates assigned to the MCU are in their cells for approximately twenty-two hours a day and are allowed into the common area twice a day, for one hour at a time, once during the morning shift (7:00 a.m. to 3:00 p.m.) and once during the evening shift (3:00 p.m. to 11:00 p.m.). *Id.* ¶ 15. Inmates are allowed to use either of the two showers while out of their cells. The only restriction is that inmates cannot take a shower during the morning shift until the showers have been cleaned and inspected by a corrections officer. *Id.*

On February 28, 2014, Ross was assigned to the Control Room in the MCU when Lattisaw and fellow inmate Mark Clower decided to take showers. *Id.* ¶ 16. Lattisaw was in the shower on the first floor and Clower was in the shower on the second floor. *Id.* After several

4

minutes, Ross told Clower to finish his shower because he was scheduled to be taken to the medical unit. *Id.* ¶ 17; ECF No. 17-3 at 118. When Clower ignored Ross's order, Ross turned off the lights to the shower areas first, followed by the water to the showers, then turned each back on, in roughly three second intervals, repeating the process three additional times over a two minute period. ECF No. 17-4 ¶¶ 17-18. Lattisaw was still in the first floor shower while this was occurring. *Id.*

Ross avers that his decision to turn the lights and water off and on was based solely upon the need to get Clower to the medical unit, and Lattisaw's presence in the shower did not factor into this decision. *Id.* ¶ 19. After Ross stopped turning the lights and water on and off, he learned that Lattisaw was complaining of injury. *Id.* ¶ 20. Ross did not say anything to Lattisaw during or after the incident. *Id.*

Lattisaw was transported by Corporal Fagnani to the medical unit, *id.* ¶ 21, where he "stated he fell in the shower and also stated the water in the shower was hot." ECF No. 17-3 at 251. Nothing in the record suggests that he complained to medical staff about being sexually assaulted. *Id.* Staff checked Lattisaw's vitals. *Id.* The medical records do not include any reference to Lattisaw sustaining burns on his body or to other obvious injury caused by his alleged fall. *Id.* Lattisaw remained in the medical unit overnight but was released the next day after indicating he had no pain. *Id.*

Defendants do not dispute that a Samsung SCB-2000 High Resolution video camera is positioned to record activity in and around the shower located on the first floor of the MCU. ECF No. 17-5 ¶ 2. Brandon Foster, Acting Director of the Detention Center, explains that each of the three cameras in the MCU is connected to a digital video recorder located on A-Block, where MCU is located, in the Mini-Control room. *Id.* ¶ 3. During the time period in question, the

5

images captured by the video cameras in the MCU were stored on a Model D16LS6TB DVR ("the DVR") that recorded 24 hours a day, seven days a week. *Id.* The DVR has an internal memory capable of storing approximately three months' worth of video feed by overwriting the earliest videos in one minute increments on a constant and revolving basis; thus, any visual evidence captured by the DVR, if not converted to a video file before that particular day in question, is overwritten, and is lost forever. *Id.*

At the time of the incident in question, the Detention Center did not have a written policy in place to preserve all videos related to complaints made by inmates. *Id.* ¶ 4. During the time in question, if an inmate made a complaint about a corrections officer, a supervisor or member of the command staff would watch a playback of the incident directly from the DVR on which it was stored; if the review revealed no wrongdoing, there was no requirement that the video be preserved. If the review revealed any type of wrongdoing, the digital recording from the DVR was converted to a video file and saved. *Id.*

After Lattisaw complained about Ross's behavior on the date in question, Sergeant Matthew Irby reviewed the footage of the incident and did not find any evidence to corroborate Lattisaw's claim against Ross. *Id.* ¶ 5. Based upon the policy in place during the time period in question, Irby was not required to preserve the video. *Id.* ¶ 6.[7]

## II. STANDARD OF REVIEW

Defendants' motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. If the Court considers matter outside the pleadings, as the Court does here, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to

---

[7] On May 9, 2016 the Court issued an Order requiring that the video surveillance referenced in the Complaint be preserved. ECF No. 3. By that date, the video had already been recorded over and was not available to be preserved.

6

dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* It is obvious that when the moving party styles its motion as a motion to dismiss for failure to state a claim or, alternatively, motion for summary judgment, as is the case here, and the nonmoving party attaches exhibits to its opposition, the nonmoving party is aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports. Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre- or post-discovery).

However, summary judgment should not be granted if the nonmoving party has not had the opportunity to discover information that is essential to his opposition to the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1987). If the nonmoving party feels that the motion is premature, that party can invoke Rule 56(d). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Under Rule 56(d), the Court may deny a motion for summary judgment if the non-movant shows through an affidavit that, for specified reasons, he cannot properly present facts essential to justify an opposition because they are unavailable to him. Fed. R. Civ. P. 56(d). "'[T]he failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity or discovery was inadequate.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citations omitted). However, a failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before

the district court served as the functional equivalent of an affidavit." *Id.* at 244–45 (citations and internal quotation marks omitted).

Lattisaw is aware that materials outside the pleadings are before the Court, and that the Court may treat the motion as one for summary judgment. Lattisaw has received copies of the exhibits that accompany the Defendants' dispositive motion, ECF No. 17, and has attached exhibits to his opposition, ECF No. 22-1. Furthermore, Lattisaw has not filed an affidavit, pursuant to Fed. R. Civ. P. 56(d), to show what essential facts, currently unavailable to him, he could present if given an opportunity to conduct discovery. Lattisaw has requested a copy of video footage showing the incident involving the shower area, but the footage is not available.[8] Further, for reasons addressed herein, the video is not sufficiently material to the outcome of this case. Thus, the Court is satisfied that it is appropriate to address Defendants' motion as one for summary judgment.

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322. The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv., Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit

---

[8] The Court accepts the veracity of Lattisaw's statements regarding Ross's turning the water and lights on and off and Lattisaw's fall in the shower area for the purpose of summary judgment review.

under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only genuine if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Id.* at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Because Lattisaw is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### III. DISCUSSION

Lattisaw brings this action under the auspices of the Eighth Amendment, alleging Ross's actions subjected him to sexual assault and amounted to an improper use of force. Lattisaw raises three Eighth Amendment claims: infliction of cruel and unusual punishment caused by Ross's actions in turning on and off the lights and water; failure to protect Lattisaw from violence when he fell outside the shower; and denial of medical or mental health treatment following a sexual assault. Lattisaw's complaint, liberally construed, also raises state tort claims for assault, battery, and negligence.

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victims safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

"A plaintiff bringing an Eighth Amendment claim must satisfy a two-part test, consisting of both an objective and a subjective inquiry, for liability to attach." *See Raynor*, 817 F.3d at 127. Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk to either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires the Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d 128–29.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk in the usual ways including inference from circumstantial evidence" so that "a

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128 (internal citation and quotation omitted).

### A. Claims Against Ross

Nothing in the record suggests that Ross's actions in turning off the lights and water were sufficiently egregious to establish Eighth Amendment liability, and nothing suggests that Lattisaw suffered any injury due to a fall sustained while escaping a blast of hot water. Lattisaw's claim that Ross "gave him the finger," if true, does not without more constitute a violation of constitutional law. *See Carter v. Morris*, 164 F.3d 215, 219 n. 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim). The gesture alleged in this case is not condoned by the Court, but even assuming it occurred, it falls short of acts forbidden by the Fourth, the Fourteenth, or the Eighth Amendments. *See Pink v. Lester*, 52 F.3d 73, 75 (1995) ("not all undesirable behavior by state actors is unconstitutional").

Lattisaw also claims that he was injured due to "sexual assault" by other inmates present in the shower area. In order to prevail on an Eighth Amendment claim of failure to protect from violence, Lattisaw must establish that Ross exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). Failure to take any action in an ongoing assault can amount to deliberate indifference. *See Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997). However, courts have recognized, that not every allegation of sexual abuse is "objectively, sufficiently serious" for purposes of the Eighth Amendment. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) ("not every malevolent touch by a prison guard gives rise to a federal cause of action") (internal citation omitted); *Boddie*, 105 F.3d at 861 ("isolated episodes of harassment and touching . . . are despicable . . . . But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court") (*citing Farmer*, 511 U.S. at

11

833–34). Instead, courts must conduct a fact-intensive, case-by-case inquiry to determine if the alleged sexual abuse was sufficiently serious. *Chapman v. Willis*, No. 7:12-CV-00389, 2013 WL 2322947, at *5 (W.D. Va. May 28, 2013).

Here, Lattisaw's claim of "sexual assault" involves lewd comments made by fellow inmates while he lay sprawled outside the shower. Nothing in the record remotely suggests that he was fondled, assaulted, or otherwise a victim of sexual assault.[9] Accordingly, there is no dispute as to any material fact that would suggest that Ross, either objectively or subjectively, violated Lattisaw's Eighth Amendment rights.

### B. Claims Against the County, Sheriff, and Director

Lattisaw has failed to establish an Eighth Amendment claim against Ross, thus barring his claims against Charles County, Charles County Sheriff Troy Berry, and Detention Center Director Captain Rice, which stem from his claim against Ross. Even if the underlying claim against Ross were to proceed, there is no doctrine of *respondeat superior* in § 1983 actions, and Lattisaw has failed to establish that the incident resulted from inadequate or improper training required by the County or that Berry or Rice failed to properly supervise Detention Center staff. *See Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 549 (D. Md. 2003) (citing *Monell v. New York Department of Social Services*, 436 U.S. 658, 694 (1978)); *see also Miller v. Hamm*, Civ. No. CCB–10–243, 2011 WL 9185, at *14 (D. Md. Jan. 3, 2011) (dismissing a plaintiff's § 1983 claim against defendants in their official capacity where the plaintiff failed to establish that defendants' policies, customs, or practices causally contributed to a constitutional violation).

---

[9] Lattisaw also argues that Defendants did not provide him mental health counseling following the event. ECF No. 22 at 3. Notwithstanding the Court's conclusion that Lattisaw was not a victim of sexual assault, the record shows that Lattisaw's mental health concerns were monitored and addressed throughout his placement at the Detention Center. Lattisaw requested a mental health/HIV consultation on March 10, 2014, and was seen two days later, on March 12, 2014. The nature of the consultation is not apparent in the record. ECF 17-3 at 159. Medical records indicate Lattisaw had a history of depression and was prescribed an antidepressant while at the Detention Center, beginning in July of 2013. *Id.* at 236–256, 260.

12

### C. State Tort Claims

The facts underpinning Lattisaw's civil rights claim, specifically that Ross acted with malice to expose him to scalding water in the shower and that the incident could have been avoided had Rice and/or Berry provided better management and training of Detention Center staff, could also be construed as a state tort claim. However, a federal court may decline to exercise supplemental jurisdiction over state law claims where it has dismissed the federal claim. 28 U.S.C. § 1367(c)(3). When, as here, the federal claim is dismissed, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction.[10] See *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Accordingly, Lattisaw's claims of assault, battery and negligence are dismissed without prejudice.[11]

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment is granted and this action is dismissed. A separate Order follows.

Dated: September 21, 2017

GEORGE J. HAZEL
United States District Judge

---

[10] Because the state law claims will not be adjudicated here, this Court need not consider Defendants' arguments concerning the limitations period for assault actions and compliance with Maryland's Local Government Tort Claims Act, Md. Code. Ann., Cts & Jud. Proc., §§ 5-301 to 5-304 (2013 Repl. Vol.).

[11] To the extent these state claims remain viable, Lattisaw may wish to pursue any appropriate action in state court.